IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,     )
                                   )
          Plaintiff,          )
                                   )
vs.                              )
                                  )     No. 26-CR-40037-SMY
CRAIG MUHS,               )
                                  )
          Defendant.       )

## STIPULATION OF FACTS

The United States of America, through Kevin F. Burke, Assistant U.S. Attorney for the Southern District of Illinois, enters into the following Stipulation of Facts with the Defendant, Craig Muhs, represented by counsel, pertaining to the conduct of the Defendant charged in the Information in this case and the relevant conduct of the Defendant within the scope of U.S.S.G. § 1B1.3. The defendant admits the facts set forth below that are described as his own acts, statements, observations, and conduct and that he personally observed certain acts and conduct of other members of the conspiracy as described below. As to factual matters not based on the defendant's firsthand participation or personal knowledge, the defendant acknowledges that the government can submit such evidence through testimony, video evidence, records, and other admissible evidence, and that such acts were reasonably foreseeable and undertaken in furtherance of the charged conspiracy. Nothing in this stipulation should be construed as an admission that the defendant personally participated in or personally witnessed every act described below except when such personal participation is specifically described. The parties hereby stipulate and agree as follows:

    1.      Lawrence Correctional Center (LCC) is a maximum-security state prison located

in Sumner, Lawrence County, within the Southern District of Illinois and is staffed by employees of the Illinois Department of Corrections (IDOC). All IDOC Correctional staff maintain facility order, ensure the safety of inmates and personnel, and accurately document all incidents. Officers perform security and custodial duties. Sergeants direct officers, supervise inmate conduct, and ensure compliance with use-of-force and disciplinary policies. Lieutenants supervise staff, inspect housing units, and manage issues involving personnel and inmates.

2. On July 31, 2025, **DALTON SHADLE** and **CRAIG MUHS** were working at LCC in their capacity as Correctional Officers, **JESSE NEWKIRK** and Co-Conspirator 6 (**CC-6**) as Correctional Sergeants, and **DANIEL FITZJARRALD** and **ETHAN YATES** as Correctional Lieutenants.

3. Among his additional duties, **SHADLE** was a member of the Emergency Response Team (ERT), which is responsible for tactical responses, high-risk transports, contraband searches, and other specialized roles. The ERT responds to "Code 1" calls within the prison for immediate assistance, which can indicate that a staff member is in distress.

4. Inmate C.W. was serving a sentence at LCC under the care, custody, and control of the IDOC.

5. On July 31, 2025, inmate C.W. approached a prison counselor inside a housing unit ("2-House") with a complaint about personal items he wanted for his cell. The counselor said that she would address inmate C.W.'s issues later. Inmate C.W. raised his voice and walked in the direction of the counselor. A Correctional Sergeant witnessed this exchange and placed himself between inmate C.W. and the counselor. Inmate C.W. then bumped his shoulder into the Correctional Sergeant prompting the Correctional Sergeant to call a "Code-1" over the radio to indicate that a staff member was in distress. The Correctional Sergeant then ordered inmate C.W.

2

to the floor and inmate C.W. complied by going to his knees and then face down on the floor, at which time the Correctional Sergeant handcuffed inmate C.W.'s hands behind his back.

6. In response to the Code-1, members of the Emergency Response Team (ERT), and others, responded to the location and placed leg restraints on inmate C.W. Inmate C.W. was then placed in what is called a "stair chair," a metal chair with wheels for rolling restrained inmates across flat surfaces and up and down stairways. During this process of restraining and placing inmate C.W. into the stair chair, **CC-6** punched inmate C.W.

7. Inmate C.W. was seated in the stair chair with leg shackles and his hands cuffed behind the chair with the cuffs secured to the rear of the chair. In accordance with LCC procedures following a Code-1 and inmate restraint, inmate C.W. was taken toward the restrictive housing unit, commonly referred to as "segregation." This was a route that required leaving the housing unit on the northwest side of the LCC grounds and exiting outside to travel southeast at a diagonal across the greater length of the LCC facility, to go through medical building before exiting outside again to go into the restricted housing unit (also called segregation). During the transport from 2-House to segregation, a cloth spit hood was placed over inmate C.W.'s head.

8. During the transport, LCC employees discussed among themselves their mistaken belief that inmate C.W. had attacked the prison counselor. Various LCC employees involved in the transport castigated inmate C.W. for attacking a female counselor.

9. The route to segregation required going through the building that houses that Health Care Unit, also referred to as the medical building. As prison staff rolled the restrained inmate C.W. toward segregation, a brief stop was made at an interlock for the Health Care Unit where there is no camera coverage. During this stop, **CC-6** again punched inmate C.W.

10. LCC policy requires that restrained inmates receive medical attention at the Health

Care Unit if requested. However, as inmate C.W. was transported through the Health Care Unit, co-conspirators falsely informed the nurses' station that inmate C.W. was refusing medical attention despite knowing that **CC-6** had assaulted inmate C.W.

11. After exiting the Health Care Unit to the outside en route to segregation, **SHADLE** punched inmate C.W. in the side of the head. At this point, **MUHS** reminded **SHADLE** that they were in view of cameras and took **SHADLE**'s place alongside inmate C.W.

12. Upon arrival at segregation, **FITZJARRALD** directed that inmate C.W. be rolled into a medical examination room. There is no camera coverage in the medical examination room.

13. While inmate C.W. was inside the examination room restrained in the transport chair with a spit hood over his head, he was struck in the back and side of the head by **CC-6**. **FITZJARRALD** punched inmate C.W. in the face several times **MUHS** punched inmate C.W. in the ribs. **NEWKIRK** punched inmate C.W. in the head. **YATES** punched inmate C.W. in the head. Further, **SHADLE** pulled open inmate C.W.'s waist band and sprayed pepper spray to the genital region of inmate C.W.

14. While inmate C.W. was inside the examination room restrained in the transport chair inside the examination room with a spit hood over his head, **NEWKIRK** tipped inmate C.W.'s chair backwards and poured water over the cloth spit hood that covered inmate C.W.'s mouth and nose, causing inmate C.W. to experience a sensation of asphyxiation.

15. At no point did **FITZJARRALD, MUHS, NEWKIRK, SHADLE, YATES**, or **CC-6** attempt to intervene to protect inmate C.W., despite having the means and opportunity to safely do so.

16. An IDOC Administrative Directive required prison staff who observe the use of force against an inmate to complete and submit an incident report. **SHADLE** provided false and

incomplete information in his incident report, and failed to note that he and other prison staff used physical force on inmate C.W. **FITZJARALD, MUHS, NEWKIRK, YATES**, and **CC-6** failed to complete incident reports as required. Further, **NEWKIRK** called **SHADLE** shortly after the incident and told **SHADLE** not to "snitch" on anyone else who was in the examination room.

17. In August 2025, investigators with the Illinois State Police conducted interviews of numerous employees regarding the July 31, 2025, assaults on inmate C.W. **FITZJARRALD, MUHS, NEWKIRK, SHADLE, YATES,** and **CC-6** all provided information that was incomplete and false. **MUHS** and **SHADLE** made some admissions, particularly as to their personal conduct, but their statements regarding the conduct of others were false and incomplete.

18. On November 4, 2025, as **NEWKIRK** was to testify in this matter in Franklin County, within the Southern District of Illinois, he falsely recanted to law enforcement his previous statement that he had seen **CC-6** strike inmate C.W.

19. As a result of the assaults by prison staff, inmate C.W. received numerous injuries, including an orbital fracture requiring reconstructive surgery.

SO STIPULATED:

_____
CRAIG MUHS
Defendant

_____
KEVIN F. BURKE
Assistant United States Attorney

_____
JUSTIN A. KUEHN
Attorney for Defendant

Date: _7-14-26_

Date: _7/14/26_

5